UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

NYKA O'CONNOR,

                Plaintiff,

v.                                           Case No. 3:18-cv-1423-BJD-PDB

JULIE JONES et al.,

                Defendants.

_____

## ORDER

### I. Status

Plaintiff, Nyka O'Connor, an inmate of the Florida Department of Corrections (FDOC) is proceeding pro se and in forma pauperis (IFP) on an amended civil rights complaint (Doc. 89). His claims arise out of alleged incidents that occurred while he was housed at Florida State Prison (FSP). After this Court's Order dismissing some claims (Doc. 167), the following claims remain: deliberate indifference against Defendants Le, Cohens, and Graham.[1]

---

[1] The Court previously dismissed Plaintiff's claims against Defendants Cohens and Graham that were based on an alleged denial of Plaintiff's requests for meals that met certain standards (for instance, those that met his health needs or were nutritionally sound). See Order (Doc. 167) at 32.

First, Plaintiff alleges Defendant Dr. Le manipulated his medical records to deny him a 4,000-calorie diet and denied him adequate medical treatment for various medical conditions. Doc. 89 at 18. Second, Plaintiff alleges Defendants Cohens and Graham, who worked in the food service area, served him meals on unsanitary trays with unsanitary utensils, which caused him to suffer "gastro viruses." Id. at 21.

Before the Court are Defendant Le's motion for summary judgment (Doc. 196), which Plaintiff opposes (Doc. 229) and Defendants Cohens and Graham's joint motion for summary judgment (Doc. 199), which Plaintiff opposes (Doc. 225).[2]

## II. Applicable Legal Standards

### A. Motion for Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston

---

[2] Defendants Cohens and Graham filed a reply (Doc. 236), and Plaintiff filed a supplemental exhibit in response to their motion (Docs. 226, 226-1).

v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. Id. Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable

3

inferences in favor of the party opposing [the motion]." <u>Hayes v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## B. Deliberate Indifference

Deliberate indifference is a difficult standard to meet given it has a knowledge component. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

> To survive summary judgment in a case alleging deliberate indifference, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."

<u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349 (11th Cir. 2003)). <u>See also</u> <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). In the medical context, deliberate indifference to an inmate's serious medical needs constitutes the unnecessary and wanton infliction of pain, which the Eighth Amendment proscribes. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976) ("Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under [§] 1983."). <u>See also</u> <u>Ancata v. Prison Health Servs., Inc.</u>, 769 F.2d 700, 704 (11th Cir. 1985) ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.").

> The first element of deliberate indifference—whether there was a substantial risk of serious harm—is assessed objectively and requires the plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." The second element—whether the defendant was deliberately indifferent to that risk—has both a subjective and an objective component. Subjectively, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... also draw the inference." Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she "knew of ways to reduce the harm" but knowingly or recklessly declined to act. Finally, the plaintiff must show a "necessary causal link" between the officer's failure to act reasonably and the plaintiff's injury.

Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (citations omitted).

The subjective-knowledge component of a deliberate indifference claim is a difficult one to prove: showing negligence will not suffice. Id. As such, disputes regarding the adequacy of medical care a prisoner received, including diagnostic testing and treatment protocols, are not actionable under § 1983. Hamm v. DeKalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985). See also Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment.").

In sum, to establish an Eighth Amendment violation, an inmate must show a prison official "actually (subjectively) knows that [the] inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007) (citing Farmer, 511 U.S. at 837, 844) (footnote omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. However, "[t]he known risk of injury must be a 'strong likelihood, rather than a mere possibility.'" Brown v. Hughes, 894 F. 2d 1533, 1537 (11th Cir. 1990). See also Bowen v. Warden, Baldwin State Prison, 826 F.3d 1312, 1321 (11th Cir. 2016) ("[I]t is only a heightened degree of culpability that will satisfy the subjective knowledge component of the deliberate indifference standard.").

### III. Dr. Le's Motion

Dr. Le moves for entry of summary judgment under Rule 56. Doc. 196 at 1. Dr. Le asserts the following grounds in support: Plaintiff cannot establish an Eighth Amendment violation because his claim is predicated on a disagreement with medical treatment; any denial of care by Defendant Le was done pursuant to FDOC or FSP policy; and Plaintiff cannot establish a causal

6

connection between Dr. Le's alleged conduct and an injury. <u>See generally</u> <u>id.</u> As the movant, Dr. Le carries a heavy burden to establish the absence of a genuine issue of material fact. Despite having the burden, Defendant Le offers no independent evidence with his motion. Dr. Le seemingly accepts Plaintiff's allegations but contends Plaintiff alleges only "a difference in medical opinion," not conduct that rises to the level of deliberate indifference.

In his response, Plaintiff relies on the allegations in his complaint, <u>see</u> Doc. 229 at 1, and he offers various exhibits, including medical and grievance records, sick-call requests, his own declaration, the transcript of his deposition taken on April 28, 2021, and information on various medical conditions he allegedly suffers (Docs. 229-1 through 229-18). As to his gastro-related medical issues, Plaintiff alleges Dr. Le denied his multiple requests for a non-standard therapeutic diet. Doc. 89 at 18. Plaintiff also alleges Dr. Le falsified his weight to deny him a 4,000-carlorie diet. <u>Id.</u> Finally, Plaintiff alleges he "needed gastro meds, etc, for [his] severe gastro pains [and] cramps," an ultrasound, and other treatment, but he did not receive it. <u>Id.</u>

Aside from his gastro-related issues, Plaintiff alleges Dr. Le denied him medical care for a host of other medical issues: headaches, migraines, and dizziness; shoulder nerve and soft-tissue damage; leg/ankle nerve damage; vision problems; and dry, cracked skin. <u>Id.</u> Plaintiff concludes, "Dr. Le was

deliberately indifferent by repeatedly refusing to prescribe adequate care for the above serious health needs." Id.

Plaintiff alleges he treated with Dr. Le on December 30, 2016, February 6, 2017, and March 17, 2017. Id. See also Doc. 229-4 at 63.[3] With his response, Plaintiff provides the relevant prison medical records for those medical visits. On December 30, 2016,[4] Dr. Le saw Plaintiff for a follow-up related to his diet pass. Doc. 229-1 at 2, 4. It appears Plaintiff reported his weight to be 138 pounds, but someone struck through the original entry ("138") and wrote instead "160." Id. at 2. A grievance response dated January 13, 2017, explains the discrepancy: Plaintiff himself reported he weighed 138 pounds, but "the doctor personally took [him] back to the scale and weighed [him] at 160 lbs." Doc. 229-5 at 2. Dr. Le renewed Plaintiff's fat intolerance pass for 90 days. Doc. 229-1 at 2. See also Doc. 229-9 at 2 (fat intolerance diet pass dated December 30, 2016). Plaintiff submitted grievances following that appointment, saying he asked Dr. Le for a non-standard therapeutic diet to address other concerns, including his weight loss, acid reflux, and religious restrictions, but Dr. Le refused his request. Doc. 229-1 at 3, 5.

---

[3] Page numbers for Plaintiff's deposition transcript are those corresponding to the internal document numbering, not to the Court's electronic management system.

[4] Plaintiff was transferred to FSP only days before this medical visit. Doc. 229-1 at 10.

8

Plaintiff also filed grievances about his shoulder pain, vision problems, and hip/knee/ankle/toe issues. Id. at 9, 11, 15. Plaintiff said he "tried presenting" these other issues to Dr. Le at his December 30, 2016 appointment, but Dr. Le "disregarded [his] issues and advised [him] to submit a sick-call." Id. Dr. Le responded to Plaintiff's three grievances in a near identical manner: "Review of your medical file shows that [since] being gained back at FSP on 12/28/16 you have not voiced any complaints related to [shoulder, vision, leg] issues through sick call and/or by declaring a medical emergency. When seen by the physician on 12/30/16 for follow up for need of diet pass you didn't voice any [complaints or issues related to your shoulder, vision, or leg]." Id. at 10, 12, 16.

Plaintiff "accessed sick call [on February 6, 2017] requesting to know the status of seeing gastro and surgeon regarding his ongoing and worsening gastro issues."[5] Doc. 229-2 at 3. Plaintiff reported in the sick-call request that he had been "awaiting gastro surgery since March 2015." Id. Nurse Johnson routed Plaintiff's chart to the clinician to "advise if another consult and medication is warranted." Id. Dr. Le evaluated Plaintiff on February 6, 2017. Id. at 2. Dr. Le's handwriting is difficult to decipher, but it is clear Plaintiff

---

[5] Plaintiff also submitted a sick-call request on January 2, 2017, but a nurse returned that request to him because it was illegible. Doc. 229-1 at 13, 17. See also Doc. 229-15 at 2.

complained about acid reflux and mentioned a current or past problem with blood in his stool. Id. Dr. Le noted Plaintiff had a "normal colonoscopy." Id. It appears Plaintiff mentioned a history of gallbladder issues as well. Id. Dr. Le continued Tums two times a day for four weeks, ordered stool cards "to rule out blood in stool," and ordered a follow-up appointment. Id. at 2, 5.

The following day, February 7, 2017, Plaintiff submitted a grievance complaining about Dr. Le's evaluation and treatment plan. Id. at 4. Plaintiff said he told Dr. Le that taking Tums twice a day was "deficient" because the medication was not effective unless he took it at least three times a day. Id. Plaintiff also asked Dr. Le to prescribe Nexium and a pain medication. Id. According to Plaintiff, Dr. Le refused to increase Plaintiff's Tums prescription and informed Plaintiff FSP does not "provide Nexium." Id.

Plaintiff also reported that he attempted to "present" other issues to Dr. Le, including those related to his "deficient diet," his "headaches, migraines, dizziness," his vision problems, his complex regional pain syndrome (affecting his legs and shoulders), his skin issues, and his toe pain, all "to no avail." Id. Dr. Le (or a designee) responded to Plaintiff's grievance on February 14, 2017, saying a review of Plaintiff's medical chart showed he had not "voiced any

complaints related to shoulder issues, blood in stool,[6] or blurry vision through sick call and/or by declaring a medical emergency." Id. at 5.

On March 17, 2017, Dr. Le saw Plaintiff again to review test results. Dr. Le noted Plaintiff was "continually refusing labs." Doc. 229-3 at 2. The medical record is largely illegible.

At his deposition, Plaintiff testified he treated with Dr. Le primarily for "gastro-related issues or problems with [his] shoulders and [his] arms." Doc. 229-4 at 63. As to the nerve damage in his shoulders/arms, Plaintiff said Dr. Le did not physically examine him, did not order diagnostic tests other than an x-ray, and did not prescribe pain medication or physical therapy. Id. at 67-69. With respect to his gastro-related issues, Plaintiff testified that Dr. Le prescribed a special diet only one time, but the diet was "contrary to [his] religious beliefs." Id. at 68, 72-73. Dr. Le allegedly would not order a special "fat intolerance vegan diet." Id. at 73. Plaintiff acknowledged that Dr. Le ordered an antacid stool card, prescribed Zantac, and ordered blood tests. Id. at 70, 73. But, Plaintiff said Dr. Le refused to give him Tums more than twice a day or prescribe Nexium. Id. at 71-72. As to his other medical conditions—

---

[6] This response appears to contradict the medical records. On February 6, 2017, Dr. Le evaluated Plaintiff and ordered stool cards "to rule out blood in stool," apparently in response to Plaintiff's reported complaints. Doc. 229-2 at 2, 5.

11

ankle weakness, vision problems, skin issues—Plaintiff said Dr. Le "didn't do anything." <u>Id.</u> at 80-81.

While Dr. Le moves for summary judgment under Rule 56, he offers no evidence. He argues instead, "Plaintiff's allegations against Dr. Le do not permit the reasonable inference that Dr. Le's care was 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Doc. 196 at 9. Accepting Plaintiff's allegations as true, Plaintiff does more than allege a difference in medical opinion. He asserts he complained to Dr. Le on multiple occasions that he had various medical issues affecting his ability to sleep, eat, and walk, yet Dr. Le essentially ignored him.

While Dr. Le clearly provided some treatment to Plaintiff on three dates, Plaintiff alleges he reported other serious medical issues, which Dr. Le ignored, and Plaintiff alleges he filed multiple sick-call requests and grievances complaining his medical needs were not being addressed. <u>See</u> Doc. 229-18 at 2, 5 (Plaintiff's declaration). <u>See also</u> Doc. 229-16 (sick-call requests). Plaintiff further alleges that, while Dr. Le prescribed medication to reduce his acid reflux, Dr. Le did nothing to address the severe "gastro pains [and] cramps that caused him to curl up in a fetus [sic] position on the floor." Doc. 229-18 at 3. Contrary to Dr. Le's assertion, Plaintiff does indeed allege Dr. Le refused to treat some of his medical conditions. <u>Cf.</u> Doc. 196 at 8 <u>with</u> Doc. 229-18 at 4-5

12

and Doc. 229-4 at 65-66, 69. If true, such conduct could constitute a constitutional violation. <u>See, e.g.</u>, <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999) ("We have repeatedly found that 'an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.'"); <u>Brown</u>, 894 F.2d at 1538 ("When prison [officials] ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference.").

In short, Dr. Le points to no evidence showing the absence of a genuine issue of material fact. On the contrary, a review of the evidence Plaintiff offers shows the parties dispute material facts: whether Plaintiff properly presented his various medical issues to Dr. Le for evaluation and treatment;[7] and whether Dr. Le, when confronted with a serious medical need, ignored Plaintiff's complaints. Dr. Le's contention that Plaintiff has "fail[ed] to establish Dr. Le's deliberate indifference to a serious medical need" is unsupported and, therefore, insufficient to carry his burden under Rule 56. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991) ("[I]t is never

---

[7] The Court's Order should not be construed as a ruling that each of Plaintiff's various medical issues constitute a serious medical need as that term is defined by Eighth Amendment jurisprudence. However, Plaintiff's allegations that he was curled up in a fetal position because of pain permits the reasonable inference he had at least one serious medical need.

enough simply to state that the non-moving party cannot meet [his] burden at trial."). Because Dr. Le has not carried his burden to demonstrate the absence of a genuine issue of material fact, Dr. Le's motion for summary judgment is due to be denied.

## IV. Defendants Cohens & Graham's Motion

Defendant Cohens, formerly the Food Service Director at FSP, and Defendant Graham, formerly the Assistant Food Service Director at FSP (collectively, "Food Services Defendants"), invoke qualified immunity, asserting there is no evidence to support Plaintiff's allegations of a constitutional violation. Doc. 199 at 15-16.[8] "The qualified immunity defense shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority." Gaines v. Wardynski, 871 F.3d

---

[8] As they did in their motions to dismiss, the Food Service Defendants argue again that Plaintiff's IFP status should be revoked because he was not truly in imminent danger when he initiated this action. Doc. 199 at 17. For the reasons stated previously, the Court declines to entertain this argument. See Order (Doc. 167) at 13-14.

1203, 1208 (11th Cir. 2017). If the defendant so shows, the burden shifts to the plaintiff to demonstrate that the defendant violated his constitutional rights and, at the time of the violation, those rights were clearly established. Id.

Here, there is no dispute the Food Service Defendants were acting in the scope of their discretionary authority. Thus, Plaintiff must demonstrate they violated his constitutional rights and at the time of the violation, those rights were clearly established.

Plaintiff alleges the Food Service Defendants would routinely "serve meals in dirty filthy plastic trays, cups, utensils, containers (kegs) with black mildew, fungus, dirt, food from prior meals, etc." Doc. 89 at 21. In its Order on Defendants' motions to dismiss, the Court found Plaintiff's claims against the Food Service Defendants could proceed because, liberally construing his allegations, Plaintiff implied they had "personally served [him] food on unsanitary trays with unsanitary utensils." See Order (Doc. 167) at 32. The Court further noted, it was unclear whether Plaintiff was proceeding against these Defendants based on their personal participation or based on their supervisory roles. Id. at 32 n.16. Extending to Plaintiff the grace of liberal construction because of his pro se status, the Court interpreted his vague allegations to suggest Defendants personally participated in the alleged unconstitutional conduct. Id.

Upon review of Plaintiff's response to Defendants' motion for summary judgment and his accompanying exhibits (Docs. 225-1 through 225-11), it has become clear Plaintiff is proceeding against the Food Service Defendants in their supervisory capacities as "Food Service Directors." Doc. 225 at 2. Plaintiff concedes, "Defendants Cohen[s] [and] Graham never personally served [him] food in any trays, cups, utensils, etc." Id. See also Doc. 225-4 at 42, 50 (Plaintiff testifying at deposition that neither Defendant Cohens nor Defendant Graham personally served him a food tray that was dirty).

As the Court previously informed Plaintiff, "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable . . . for the actions of a subordinate is extremely rigorous." Id. Absent personal participation, supervisor liability arises only "when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Mathews v. Crosby, 480 F.3d 1265, 1270 (11th Cir. 2007) (internal quotation marks and citation omitted).

> The necessary causal connection can be established "when a history of widespread abuse puts the

16

responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Alternatively, the causal connection may be established when a supervisor's "custom or policy ... result[s] in deliberate indifference to constitutional rights" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

Cottone, 326 F.3d at 1360 (internal citations omitted).

Plaintiff attempts to demonstrate Defendants Cohens's and Graham's personal participation in an alleged constitutional violation by asserting they themselves were responsible for "sanitizing EACH MEAL . . . [and] to inspect food service areas on a daily basis." Id. The Food Service Defendants each offer a declaration in support of their motion. Neither avers their responsibilities included cleaning or sanitizing dishes themselves. See Doc. 199-2 ¶ 1; Doc. 199-3 ¶ 1. With respect to sanitation of food trays, cups, and utensils, the Food Service Defendants aver as follows:

All inmate food trays, cups and utensils are washed and sanitized with bleach before [and / or] after every meal. Only washed and sanitized trays, cups and utensils are used for the service of food or beverages. The washing of food trays, cups and utensils were monitored daily by a sanitation supervisor who tested the bleach ratio used in sanitizing trays, cups and utensils to maintain proper sterilization and sanitation. To my knowledge, all trays, cups and utensils were properly cleaned and sanitized with bleach prior to being used in food service as per Department policy and procedure.

17

Doc. 199-2 ¶ 2; Doc. 199-3 ¶ 2.

At his deposition, Plaintiff stated the Food Service Defendants would have known the trays were filthy or unsanitary because it was their job to supervise and monitor food service. Doc. 225-4 at 42-43, 50-51. Plaintiff also speculated they may have participated in preparing food trays. Id. at 55. Plaintiff testified,

> They job duties, a food service person, they are required to oversee the trays they made and make sure they correct. And sometimes they might even help make these trays. . . . It's their jobs. . . . They're responsible for overseeing these trays and meals being cooked according to what the Eighth Amendment require [sic], and they violated my Eighth Amendment.

Id. at 55, 56-67.

Neither Food Service Defendant avers the job duties associated with their respective positions included food preparation. Doc. 199-2 ¶ 1; Doc. 199-3 ¶ 1. However, they both acknowledge their job duties included supervision of food service staff, including inmate orderlies. Id. Additionally, Defendant Cohens's job duties, as the Director, included responding to inmate grievances. Doc. 199-2 ¶ 1.

Even though the Food Service Defendants, in their roles as food service supervisors, could have or should have observed the alleged unsanitary conditions of food preparation and delivery, a prison official's "failure to

18

alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." <u>Farmer</u>, 511 U.S. at 838. Moreover, any failure to closely or properly supervise food service staff or inspect food before it left the prison kitchen amounts to negligence, not deliberate indifference. <u>See</u> <u>Hamm</u>, 774 F.2d at 1575 ("The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."); <u>Stallworth v. Wilkins</u>, 802 F. App'x 435, 443-44 (11th Cir. 2020) ("While '[t]he Constitution requires that prisoners be provided reasonably adequate food,' this Court has held that food 'occasionally contain[ing] foreign objects' and falling below food preparation standards "does not amount to a constitutional deprivation." (quoting with alterations <u>Hamm</u>, 774 F.2d at 1575)).

Plaintiff also attempts to demonstrate the requisite causal connection by showing he submitted numerous grievances complaining about sanitation problems with the food service at FSP, such as "slimy" vegetables, "white particles from dirty milk kegs" appearing in food and drinks, "oily trays," food served with "black inedible particles . . . [and] sometimes worms," food served with "black mildew looking matter," exposure to feces, and trays and cups

having a "foul smelling odor." Doc. 225 at 2-3. He provides copies of the grievances.

According to the grievance records Plaintiff provides, he complained of dirty, unsanitary food items, trays, or drinks five times between September 2017 and December 2017.[9] See generally Doc. 225-1. First, on September 18, 2017, Plaintiff submitted an informal grievance (inmate request form) complaining trays were "still filthy," with food from prior meals present, and the beans "still [had] black [illegible] particles, with pebbles [and] sometimes worms." Id. at 9. R. Davis denied his grievance on September 22, 2017. Id. Plaintiff appealed. The responders—J. McClellan and another employee whose signature is indecipherable[10]—provided the following response: "Food Service

---

[9] Plaintiff says in his response that "[t]he specific dates and other facts are outlined in [his attached] grievances." Doc. 225 at 4. Despite that, he says, without explanation or elaboration, that the food service conditions of which he complains had been "ongoing for years," between 2013 and 2017. Id. When asked repeatedly at his deposition to explain each instance in which he received filthy trays, Plaintiff responded, "go look at the grievance log." Doc. 225-4 at 31, 33, 36, 43, 49, 50, 52-53. Aside from the grievances Plaintiff submits with his response, Plaintiff points to no other instance in which he received filthy trays, cups, or utensils. Moreover, according to an FDOC movement/transfer history, Plaintiff was not housed at FSP for a majority of the time he contends there was a problem with food service there: between January 15, 2014, and December 27, 2016, Plaintiff was housed at other institutions. Doc. 236-1 at 1-2.

[10] Defendant Cohens was not working at FSP when Plaintiff submitted this grievance. Doc. 236-2 at 1. The signature does not match that of Defendant Graham. Cf. Doc. 199-3 with Doc. 225-1 at 8.

Staff advised that all meals are inspected prior to departing the kitchen." Id. at 8.

Second, on September 22, 2017, Plaintiff submitted an informal grievance complaining the trays were "filthy . . . with food from prior meals, black dirt, black mildew looking matter, dried white substance like flour, etc, still on these oily filthy trays." Id. at 14. Plaintiff also reported that he had "witnessed [and] heard inmates place feces, urine, semen, spit, etc on trays when done eating." Id. R. Davis denied his grievance, explaining as follows: "[A]ll trays are cleaned and sanitized after each use." Id.

Plaintiff appealed the decision. Id. at 13. He stated his appeal concerned the following: "Filthy trays that can cause food poison[ing], H-Pylori, Hepatitis, etc." Id. (emphasis added). The response was as follows: "Food Service staff was contacted and stated that all trays are washed, rinsed and sanitized to 55 parts per million. A sanitation supervisor has been assigned to maintain compliance as outline[d] in Procedure 64E-11. Food service staff indicated that new trays have been ordered." Id. at 12. Plaintiff appealed that decision to the Office of the Secretary of the FDOC, saying the ordering of new food trays was proof that FSP's trays had been filthy. Id. at 11. He suggested FSP needed " to get a new dishwasher." Id. His appeal was denied. Id. at 10.

Third, on October 17, 2017, Plaintiff submitted an informal grievance reporting he had been served a breakfast tray with "white/grey matter" that looked like paint. Id. at 18. An officer allegedly "verified it look[ed] like paint [was] all over the tray." Id. His grievance was denied because "all trays are washed, rinsed and sanitized before serving." Id. Plaintiff appealed to the Warden's office and then to the Secretary's office. His appeals were denied with the same explanations as those previously provided. Id. at 15-17.

Finally, Plaintiff submitted two informal grievances on November 9, 2017. In one, he complained that he found a "green vegetable leaf in [the] juice keg." Id. at 7. His grievance was denied with an explanation that "[j]uice kegs are washed, rinsed [and] sanitized after each use." Id. In the other informal grievance submitted the same day, Plaintiff reported there were "white particles in juice at breakfast," which he thought were "probably from dirty milk kegs." Id. at 4. The grievance was denied with the same explanation as his other grievance dated the same day. Id.

Plaintiff ultimately appealed both denials to the Secretary's office, complaining that the "boilerplate responses" he received at the institution level were insufficient. Id. at 3, 6. One appeal was denied with the following response: "The response that you received . . . appropriately address[es] the concerns you raised. In addition, food service was contacted and stated that a

22

'Weekly Food Service Sanitation Inspection' is conducted and notated on a DC 2-407 to ensure all requirements are being met." <u>Id.</u> at 2. The other appeal, however, was "approved for further inquiry," with the appeal being sent to the Warden of FSP "for appropriate handling and action." <u>Id.</u> at 5.[11]

In addition to his own grievances, Plaintiff offers the declaration of another inmate, Billy Ford, dated November 15, 2017. Doc. 226-1. Inmate Ford avers that food trays at FSP were "unsanitary" at that time, but he did not provide any indication of how often he personally received or observed filthy food trays. <u>Id.</u> He explained some food had "residue/food" from prior meals, or sometimes there would be "black caked-up filth on the trays." <u>Id.</u> Inmate Ford does not aver he personally became sick from using a filthy food tray, nor does he aver he ever declined a food tray or submitted grievances complaining about dirty food trays.

The Food Service Defendants aver they had no knowledge of "dirty or unsanitized trays, cups or utensils . . . [ever being] used, served, or verified as used or served to [Plaintiff]." Doc. 199-2 ¶ 3; Doc. 199-3 ¶ 3. However, accepting as a reasonable inference that the Food Service Director and Assistant Food

---

[11] Plaintiff appears to have submitted another grievance in December 2017, but he provides only his appeal to the Secretary's office and the response, neither of which provide details about his complaint. <u>See</u> Doc. 225-1 at 20-21. His appeal was "approved for further inquiry." <u>Id.</u> at 20.

Service Director, by virtue of their positions, had to have known that, between September and December 2017, Plaintiff reported receiving or observing food trays that could be described as "filthy," Plaintiff's claims still fail. Defendant Cohens was not even working at FSP when Plaintiff submitted his grievances. Doc. 236-2 at 1 (declaration of Christian Cea, Human Resources Consultant for the FDOC). Thus, any claim against Defendant Cohens necessarily fails.

With respect to Defendant Graham, Plaintiff's claim fails for at least two reasons. First, accepting as a permissible inference that Defendant Graham, as the Assistant Food Service Director, had to have known that an inmate had been complaining about dirty dishes, the evidence also permits the reasonable inference the food service staff was not deliberately indifferent to those complaints. As Plaintiff's grievance response shows, the food service staff ordered new trays during the time-period Plaintiff complained there was a problem. See Doc. 225-1 at 12.

Second, Plaintiff presents no evidence showing Defendant Graham was aware of more than a "generalized awareness of [a] risk" of harm posed by the condition of the trays. Marbury, 936 F.3d at 1234. "[A] plaintiff must show 'more than a generalized awareness of risk' to make out a deliberate-indifference claim." Id. Notably, in none of his grievances did Plaintiff complain he had become sick from having received a filthy food tray. See generally Doc.

24

225-1. And Defendants offer the declaration of Kellie Caswell, RN, BSN, who avers, "There is no indication in the medical records that [Plaintiff] suffered from any physical injury or gastrointestinal issue while housed at [FSP] that can be attributed to receiving and eating food on allegedly dirty food trays, cups or utensils." Doc. 199-1 ¶ 13. Nurse Caswell further avers, "There is no indication documented in the medical records that [Plaintiff's] chronic acid reflux complaints, occasional nausea and/or vomiting, or gastrointestinal pain is related to consuming food from alleged dirty food trays, cups or utensils." Id. ¶ 15.

The only evidence Plaintiff offers in opposition to Defendants' evidence is a sick-call request dated December 4, 2017, and an informal grievance dated April 22, 2018. Doc. 225-5 at 2, 3. See also Doc. 225 at 5 (referencing the sick-call and informal grievance as evidence supporting his claims). In the sick-call request, which a nurse—not Defendant Graham—received and processed, Plaintiff complained that he had "serious stomach pains, cramps, runs, etc." Doc. 225-5 at 2. Plaintiff speculated that "someone [was] messing with [his] food," or, if not that, then he "probably caught [a] stomach virus AGAIN from these filthy trays." Id. (emphasis in original).

In the informal grievance, which Plaintiff submitted to the mental health department—not to the food service area or to Defendant Graham—Plaintiff

25

requested a prescription for "mental health Styrofoam tray[s]" because he believed the plastic trays were too filthy to eat from, and he said he "previously caught [a food virus] from said filthy trays." Id. at 3. There is no evidence Defendant Graham saw or was made aware of this grievance. The mental health doctor who responded to the request directed that it be forwarded to the "medical department," not to food service supervisors. Id.

Even accepting as true that Plaintiff experienced on more than one occasion an upset stomach or bowel-related issues from having been served dirty food trays, there is no evidence that Defendant Graham knew of such occurrences. In fact, Defendant Graham avers she "did not have access to [Plaintiff's] medical records or medical conditions." Doc. 199-3 ¶ 5. As such, Plaintiff cannot demonstrate Defendant Graham knew the condition of the meal trays "posed an unreasonable risk of serious injury to his future health or safety." See Marbury, 936 F.3d at 1233. Accordingly, his deliberate indifference claim fails. See Oliver v. Fuhrman, 739 F. App'x 968, 970 (11th Cir. 2018) (affirming sua sponte dismissal of the plaintiff's complaint because he failed to allege facts showing his use of "unclean dishes was the cause of any identifiable medical issue" or that the defendants knew unclean dishes were causing inmates to get sick).

Moreover, even accepting that Defendant Graham knew Plaintiff had become sick on more than one occasion because of unsanitized food trays, Plaintiff fails to demonstrate "a persistent and wide-spread practice" to meet the stringent standard for supervisory liability under § 1983. See Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007) ("[D]eprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.").

In other words, accepting as true that Defendant Graham knew of Plaintiff's reports of unsanitary food trays or spoiled food or drink and further knew that Plaintiff had become sick as a result, those isolated occurrences do not demonstrate that the potentially unsafe food trays at FSP resulted in a danger that was "obvious, flagrant, [or] rampant." See Keith, 749 F.3d at 1048. See also Harrison v. Culliver, 746 F.3d 1288, 1299 (11th Cir. 2014) (holding that evidence of thirty-three incidents of inmate-on-inmate attacks involving weapons over a three-year period did not demonstrate inmates were "exposed to . . . the constant threat of violence" sufficient to impose supervisory liability against the warden, who knew about the thirty-three incidents); Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1267 (11th Cir. 2010) (holding a school principal's knowledge of two complaints of sexual assault against a

math teacher were insufficient to demonstrate the principal was aware of a history of constitutional deprivations that could be described as obvious, flagrant, or rampant).

For the reasons stated, Defendants Cohens and Graham are entitled to qualified immunity, and their motion is due to be granted to that extent.

Accordingly, it is now

**ORDERED:**

1.     Defendant Chuong Thanh Le's motion for summary judgment (Doc. 196) is **DENIED**.

2.     Defendants Cohens and Graham's motion for summary judgment (Doc. 199) is **GRANTED**. Defendants Cohens and Graham are entitled to summary judgment as to all claims asserted against them. Judgment to that effect will be withheld pending adjudication of the action as a whole.  See Fed. R. Civ. P. 54.

3.     Plaintiff's motion for leave to redact (Doc. 250) is **GRANTED**. Given Plaintiff has withdrawn his arguments related to previously dismissed claims, Defendants Cohens and Graham's objections to Plaintiff's irrelevant arguments and exhibits (Docs. 235, 236) are **overruled as moot**.

4.     The Court is convinced that there are sufficiently complex factual and legal issues involved to warrant appointment of counsel for Plaintiff. As

such, this case is **REFERRED** to the Jacksonville Division Civil Pro Bono

Appointment Program so the designated deputy clerk of the Court may seek

counsel to represent Plaintiff.

      **DONE AND ORDERED** at Jacksonville, Florida, this 2nd day of March

2022.

                                                    BRIAN J. DAVIS
                                  United States District Judge

Jax-6
c:
Nyka O'Connor
Counsel of Record